DOCTORS COUNCIL OF THE DISTRICT OF COLUMBIA GENERAL HOSPITAL, Appellant,

v.

DISTRICT OF COLUMBIA PUBLIC EMPLOYEE RELATIONS BOARD, et al., Appellees.

No. 02–CV–1255.

District of Columbia Court of Appeals.

Argued Jan. 7, 2004.
Decided Jan. 11, 2007.

Linda M. Correia, with whom Bruce A. Fredrickson, Washington, and Jeffrey E. Fallon were on the brief, for appellant.

David R. Levinson, Washington, for appellee.

Arabella W. Teal, Interim Attorney General at the time, and Charles L. Reischel, Deputy Attorney General at the time, filed a statement in lieu of brief for appellee District of Columbia as successor in interest to the Health and Hospitals Public Benefit Corporation and the D.C. General Hospital.*

Before WASHINGTON, Chief Judge,** and RUIZ and REID, Associate Judges.

REID, Associate Judge:

Appellant, Doctors Council of the District of Columbia General Hospital ("Doctors Council–Hospital Physicians"), appeals from a judgment of the trial court sustaining a decision by the District of Columbia Public Employee Relations Board ("PERB") in favor of the District of Columbia General Hospital ("DCGH" or "the Hospital"). The complaint which triggered this matter revolves around compensation and alleged unfair labor practices relating to two collective bargaining units, Doctors Council–Hospital Physicians which represented Hospital doctors employed by DCGH, and Doctors Council of the District of Columbia ("Doctors Council–Clinic Physicians") which represented clinic doctors employed by the Commission on Public Health, Department of Human Services prior to their transfer to DCGH and the Public Benefits Corporation ("PBC").

Doctors Council–Hospital Physicians challenges the PERB's interpretation of the District of Columbia Health and Hospitals Public Benefit Corporation Act, of 1996 ("PBC Act"), D.C. Law 11–212, D.C.Code §§ 32–261.1, et seq., (1998), recodified as D.C.Code §§ 44–1101–01, et seq., (2001).[1] We hold that PERB unreasonably interpreted D.C.Code § 32–262.8(h) (regarding the PBC and existing collective bargaining agreements and personnel administration) by declaring, in essence, that § 32–262.8(h) trumped D.C.Code § 1–618.4(a)(3) and (5) prohibiting specified unfair labor practices (but did not trump § 1–618.4(a)(2), also precluding a specified unfair labor practice). We also hold that PERB incorrectly dismissed Doctors Council–Hospital Physicians' complaint because (1) DCGH was required to implement the pay parity agreement between it and Doctors Council–Hospital Physicians since that agreement was reached prior to December 17, 1996, the first meeting of the PBC Board, and the PBC did not

---

* At the time the statement was filed, Ms. Teal and Mr. Reischel were called Interim Corporation Counsel and Deputy Corporation Counsel, respectively. Since that time, however, the Mayor of the District of Columbia has issued an executive order re-designating the Office of Corporation Counsel as the Office of the Attorney General for the District of Columbia. *See* Mayor's Order No.2001–92, D.C.Reg. 6052 (May 26, 2004) (citing D.C.Code § 1–204.22(2) & (11) (2001)). We therefore employ the titles applicable at the time of this opinion's publication.

** Judge Washington was an Associate Judge of the court at the time this case was argued. His status changed to Chief Judge on August 6, 2005.

1. On August 28, 1996, the Council of the District of Columbia approved the Health and Hospitals Public Benefit Corporation Emergency Act of 1996. D.C. Act 11–388, 43 DCR 4937 (1996). Subsequent emergency acts were approved by the Council, and eventually D.C. Law 11–212, Health and Hospitals Public Benefit Corporation Act of 1996, became law on April 9, 1997. The PBC was abolished and the PBC Act was repealed by section 9(a) of the Health Care Privatization Amendment Act of 2001, D.C. Law 14–18, 48 DCR 4047, 4055 (July 12, 2001). Under D.C.Code § 7–1402(d) (Supp.2006), all employees of the PBC were transferred to the Department of Health. Section 7–1403 provided that: "All liabilities of the Public Benefit Corporation shall be assumed by the District of Columbia."

assume management and control over the Hospital and Doctors Council–Hospital Physicians until October 1, 1997; and (2) DCGH/PBC engaged in discriminatory unfair labor practices by discouraging membership in Doctors Council–Hospital Physicians and encouraging membership in Doctors Council–Clinic Physicians (§ 1–618.4(a)(3)). In short, PERB erred by rejecting the findings, conclusions and recommendation of the Hearing Examiner with regard to DCGH's violation of D.C.Code § 1–618.4(a)(3).

We also conclude that PERB should not have dismissed Doctors Council–Hospital Physicians' complaint with respect to its contention that DCGH refused to bargain with it in good faith in early 1997 concerning a new collective bargaining agreement (§ 1–618.4(a)(5)). Consequently, we reverse the judgment of the Superior Court, with instructions to remand the case to the PERB with further instructions (1) to vacate its decision and order dismissing Doctors Council–Hospital Physicians' complaint with respect to the violation of D.C.Code § 1–618.4(a)(3) and to enter an order adopting the Hearing Examiner's findings, conclusions and recommendation regarding wage parity for doctors who are members of Doctors Council–Hospital Physicians; and (2) to vacate its decision and order dismissing Doctors Council–Hospital Physicians' complaint regarding the violation of D.C.Code § 1–618.4(a)(5) and to decide whether the record supports the Hearing Examiner's findings and con-

clusions as to DCGH's alleged refusal to bargain in good faith with Doctors' Council–Hospital Physicians.

## FACTUAL SUMMARY

This case has had a long history. On June 19, 1997, Doctors Council–Hospital Physicians filed a complaint against DCGH, alleging unfair labor practices under D.C.Code § 1–618.4(a)(2), (3) and (5) (1999), recodified at D.C.Code § 1–617.04(a)(2), (3), and (5) (2001).[2] Doctors Council–Hospital Physicians, which had been certified since 1985 as the collective bargaining representative of medical officers employed by DCGH, claimed, in part, that (1) "[s]ince on or about February 25, 1997," DCGH had "interfered with the administration of [its] Labor Organization [] by publicly expressing a preference" for another labor organization as the collective bargaining agent for doctors employed at the Hospital and at clinics (§ 1–618.4(a)(2)); (2) the Hospital had discriminated against its members by "refusing to compensate them at levels equal to the compensation of other medical officers employed by [the Hospital] who are not represented · by [Doctors Council–Hospital Physicians];" that medical officers assigned to clinics, rather than the Hospital, received approximately $10,000.00 more in compensation per year than medical officers who "perform[ed] comparable and substantially equal work" at the Hospital; and that DCGH "has failed and refused to

---

**2.** D.C.Code § 1–617.04(a)(2), (3) and (5) (2001) provide:

§ 1–617.04. Unfair labor practices [Formerly § 1–618.4]
(a) The District, its agents, and representatives are prohibited from:....
(2) Dominating, interfering with, or assisting in the formation, existence or administration of any labor organization, or contributing financial or other support to it, except that the District may permit employ-

ees to negotiate or confer with it during working hours without loss of time or pay;
(3) Discriminating in regard to hiring or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization, except as otherwise provided in this chapter;
.... or
(5) Refusing to bargain collectively in good faith with the exclusive representative.

provide equal pay to medical officers all because of their membership in and representation by Complainant [Doctors Council–Hospital Physicians] and in order to discourage such membership in and representation by Complainant [Doctors Council–Hospital Physicians], and in order to encourage membership in and representation by [Doctors Council–Clinic Physicians]" (§ 1–618.4(a)(3)); and (3) since around April 24, 1997, DCGH had "failed to bargain in good faith with [] Doctors Council–Hospital Physicians by reneging on its agreement for a compensation agreement with [DCGH] for fiscal years 1992 through 1997;" and that an "agreed upon compensation agreement" was sent to the Mayor and Council of the District of Columbia on March 12, 1997, but that around April 24, 1997, DCGH "refused to assure [the Mayor] that it had funds available to cover the ... agreement" (§ 1–618.4(a)(5)).

A hearing on the complaint took place on September 9, 1997, before Hearing Examiner, Robert J. Perry, Esq. Only two witnesses testified, Dr. Kenneth Dais, President of Doctors Council–Hospital Physicians since 1979 and the director of cardiology at the Hospital, and Yakini Martin, a Doctors Council–Hospital Physicians labor specialist consultant. Dr. Dais indicated that a collective bargaining agreement between Doctors Council–Hospital Physicians and DCGH, which technically had expired in 1991, had been "rolling over from year-to-year" in the absence of a new agreement. This agreement did not cover medical officers working in clinics who were employed by the District of Columbia Department of Human Services ("DHS") and represented by another bargaining agent. "[O]nce the rumor came out in September of 1996 that the [medical clinic] doctors would be transferred to DCGH," hospital doctors demanded equal pay from DCGH "on numerous occasions."

The medical clinic doctors were transferred to DCGH on October 1, 1996 under an Interagency Agreement between DCGH and DHS. Upon their transfer to DCGH, there was "an average of $9,500 difference [in compensation] between physicians employed in the Neighborhood Health Clinics and physicians who are employed at the [H]ospital," and further, unlike doctors at the Hospital, clinic medical officers received compensation for "on-call pay." On November 5, 1996, the Executive Director of DCGH sent a memorandum to the City Administrator "request[ing][his] approval for [DCGH] to move forward in resolving a serious situation involving the disparity in compensation between physicians and nurses employed at [DCGH] and those employed at eleven (11) Ambulatory Health Care Clinics." The memorandum identified "a significant pay disparity of as much as 10% [in the pay of clinic doctors compared with Hospital physicians] even though the clinic [p]hysician's duties and responsibilities may not be as demanding as those employed at the Hospital."

Documents referenced by Dr. Dais during his testimony revealed that the PBC Board "was established in December of 1996, when it had its first board meeting." [3] At a PBC Board meeting, which

3. The question as to when the PBC's authority over DCGH began is not a simple one. The PBC Act became effective on August 28, 1996. *Doctors Council of the District of Columbia Gen. Hosp. v. District of Columbia Gen. Hosp.,* PERB Case No. 97–U–24, Opinion No. 525, November 18, 1997 ("*Op. No. 525*"), at 2.

But, agencies scheduled to be transferred to the PBC under the PBC Act were not subject to the restrictions on bargaining embodied in that Act until their transfer to the PBC. *District of Columbia Nurses Ass'n v. Mayor of the District of Columbia and District of Columbia Health and Hosps. Pub. Benefit Corp., District*

Dr. Dais attended on February 25, 1997, a memorandum from the Hospital's Executive Director and its General Counsel, dated February 20, 1997, was distributed. The memorandum recommended that Doctors Council–Clinic Physicians be the collective bargaining representative for all of the doctors employed by the Hospital.[4] Dr. Dais stated at the hearing that DCGH management evidenced hostility toward Doctors Council–Hospital Physicians and toward him personally. The Hospital expressed its preference for Doctors Council–Clinic Physicians in meetings; had an open-door policy for that organization and a closed-door policy for Doctors Council–Hospital Physicians. Moreover, the Executive Director of DCGH called him an "irritant," said he was "full of sh*t" and "obstructive." The Executive Director of the Hospital became angry when Doctors Council–Hospital Physicians opposed the Hospital's decision to use outside contractors to provide medical services, and when Doctors Council won arbitration cases opposing the contracting out policy.

Dr. Dais' testimony also focused on the new, proposed collective bargaining agreement between Doctors Council–Hospital Physicians and DCGH which provided for pay parity between clinic and Hospital doctors at an annual cost of $750,000 (for nine months) and $900,000 (for twelve months). The agreement was sent to the Mayor on March 7, 1997 ("for subsequent transmittal to the Council of the District of Columbia"), as well as to the Mayor's Chief of Staff and the City Administrator on March 12, 1997.[5] However, the Executive Director of the DCGH failed to confirm the availability of funds to implement the agreement. Instead, on May 12, 1997, he asserted in a Memorandum to the Deputy City Administrator an inability to "provide a definitive assurance that funds are available for this activity at this time." A letter dated May 23, 1997, from the Deputy City Administrator to DCGH, indicated that the Mayor would not sign the agreement because of lack of assurance as to the funding source for its implementation. Although the Mayor forwarded the compensation agreement to the Council for approval on September 12, 1997, it was returned to him on September 25, 1997, due

of Columbia Gen. Hosp., PERB Case No. 95–U–03, Opinion No. 565, October 21, 1998 ("Op. No. 565"), at 6 ("We hold ... that the PBC was bound to implement bargained terms and conditions of employment reached either by agreement or as a result of statutory impasse resolution processes initiated before the transfer of covered employees."); see also "(District of Columbia Health and Hosps. Pub. Benefit Corp. and All Unions Representing Bargaining Units in Compensation Units 12, 20, 21, 22, 23 and 24 and employees employed by the Health and Hosps. Pub. Benefit Corp.," PERB Case Nos. 97–UM–05, 97–CU–02 and 99–U–02, Opinion No. 604, November 24, 1999 "Op. No. 604),'" at 6 ("[W]e held that agencies affected by the PBC Act (which included DCGH and DHS clinics) became subject to the PBC's bargaining constraints when they were transferred to the PBC."). PERB concluded that the transfer of affected agencies to DCGH occurred "sometime between September 29 and October 1, 1996." Op. No. 565, at 6 (citing Op. No. 525, at 4.). However, PERB determined that PBC did not "assume[] actual management and control of the functions of the agencies placed under it" until October 1, 1997, Op. No. 525, at 7 n. 8; see also Op. No. 604, at 6 n. 4. The first meeting of the PBC Board took place on December 17, 1996, Op. No. 525, at 6 n. 7.

4. At that time, Doctors Council–Clinic Physicians represented 40 clinic physicians, and Doctors Council–Hospital Physicians represented 130 Hospital doctors.

5. According to the Memorandum from the Acting Chief Executive Officer of the DCGH, the agreement "resolve[d] the disparity in pay issue between the clinic physicians and the physicians at the hospital, but [did] not provide for any retroactive pay for fiscal years 1992, 1993, 1994, 1995, nor 1996."

to lack of funding certification. Dr. Dais declared that between January 1997 and the transmittal of the compensation agreement to the Mayor, no one at the Hospital had mentioned the lack of monies to fund the agreement.[6]

Ms. Martin testified that at "a forced meeting" in Fall 1996, Hospital management showed hostility toward Dr. Dais and toward her. On one particular occasion the Executive Director of the Hospital "use[d] profanity at [her] [while] flailing his hands," when she asked him about his alleged preferential treatment of Doctors Council–Clinic Physicians. On another occasion while she was in attendance at a labor/management meeting, the Executive Director confronted her and demanded that she put her role in writing, something that he had never requested of others acting in a similar capacity.

In his report and recommendation of December 22, 1997, the Hearing Examiner stated: "Both Dr. Dais and Ms. Martin testified in a straight-forward manner and they were quite impressive as witnesses. I fully credit the testimony of Dr. Dais and Ms. Martin." The examiner found that DCGH "violated [D.C.Code § ] 1–618.4 [ (a)(2) ] of the CMPA [Comprehensive Merit Personnel Act] by providing unlawful assistance to Doctors Council–Clinic Physicians." The examiner also determined that DCGH violated § 1–618.4(a)(3) "by failing to adjust employee pay scales for reasons that are discriminatory in nature" (preference for Doctors Council–Clinic Physicians and refusal to take action even though acknowledging the pay disparity between clinic and Hospital doctors):

Also at issue was the salary differential between the two groups. The clinic medical officers were receiving considerably more in wages than the hospital medical officers, even though both groups were performing substantially the same work. When Complainant Union [Doctors Council–Hospital Physicians] raised the issue with Respondent [DCGH], there was no disagreement over the need to adjust the pay scale to provide parity for the hospital medical officers. In fact, [DCGH] has consistently taken the position that there is a serious disparity in the wage structure of the two groups. However, recognizing the problem and dealing with it are two different things. [DCGH] has been aware of the problem since at least October 1, 1996 and it has not taken any action to resolve it. Nor has it offered any lawful explanation for its failure to deal with the issue.

I do not believe that one has to speculate concerning [DCGH's] motivation for failing to take the action it knew was required. [DCGH's] Executive Director [] supplied the answer when he told the employees that Complainant Union was responsible for their failure to receive pay parity. I have previously found that [DCGH's] overall objective was to force a change in the hospital medical officers' bargaining representative by replacing [Doctors Council–Hospital Physicians] with [Doctors Council–Clinic Physicians]. In fact, all of the evidence of illegal assistance to [Doctors Council–Clinic Physicians] was designed to achieve that goal. However, this is the exact type of discrimination Section 1–618.4(a)(3) makes unlawful. [DCGH] clearly evidenced a discriminatory motive when it failed to adjust the pay scales and this affected "a term and

6. Doctors Council–Hospital Physicians introduced a number of exhibits related to Dr. Dais' testimony.

condition of employment within the meaning of Section 1–618.4(a)(3).... Accordingly, I find that [DCGH] violated Section 1–618.4(a)(3) of the CMPA [Comprehensive Merit Personnel Act] by failing to adjust employee pay scales for reasons that are discriminatory in nature."

Hearing Examiner's Report and Recommendation, PERB Case No. 97–U–25 ("Hearing Examiner's Report"), at 6–7 (footnote omitted). Finally, the Hearing Examiner concluded that DCGH violated D.C.Code § 1–618.4(a)(5) requiring good faith bargaining with a labor representative, see *supra* note 7, "by reneging on its contractual agreement with [Doctors Council–Hospital Physicians] and by thereafter acting in a manner designed to elicit disapproval of the agreement by the Mayor and [] Council [of the District of Columbia]." This finding concerned the collective bargaining agreement (sent to the Mayor on March 7, 1997, and the Mayor's Chief of Staff and City Administrator on March 12, 1997) "on all compensation issues." The collective bargaining agreement, the Hearing Examiner referenced a statement of April 24, 1997, by DCGH/PBC questioning whether it had the funds to cover the agreement, and a May 12, 1997 memorandum from the Hospital's Executive Director to the City Administrator indicating that he "cannot provide a definitive assurance that funds are available," and the examiner concluded:

There is nothing in this record to suggest that [DCGH] is unable to properly fund the compensation agreement with [Doctors Council–Hospital Physicians]. Rather, this is a situation where [DCGH] reached agreement with [Doctors Council–Hospital Physicians] only to avoid the expense and uncertainty of arbitration and then thereafter has engaged in this subterfuge to get out from under the agreement. Accordingly, I find that on April 24, 1997 and thereafter, [DCGH] engaged in bad faith bargaining by reneging on its agreement with [Doctors Council–Hospital Physicians] and by acting in a manner designed to ensure that the agreement would not receive the approval of the Mayor and [] Council [of the District of Columbia]....

Hearing Examiner's Report, at 9 (footnote omitted).

No exceptions to the Hearing Examiner's report were filed, but the PERB nevertheless reviewed the Hearing Examiner's findings and conclusions under its power to "[d]ecide whether unfair labor practices have been committed and [to] issue an appropriate remedial order." D.C.Code § 1–605.2 (1999), recodified as 1–605.02 (2001). PERB issued its decision and order on February 23, 1998. It determined that the "Hearing Examiner's findings of fact [are] supported by the record," but "reject[ed] [several of the Hearing E]xaminer's conclusions as contrary to [PERB's] holding in *DCDCGH v. DCGH*," No. 97–U–24, *supra*, including the Hearing Examiner's conclusion regarding pay parity. Specifically, PERB stated:

In PERB Case No. 97–U–24, ... we held that under the [PBC] Act, "notwithstanding the transfer of [Doctors Council–Clinic Physicians'] medical officers to [the DCGH's] authority, [DCGH] was legally obligated under the Act to continue recognizing the collective bargaining representative [i.e., Doctors Council–Clinic Physicians], and the collective bargaining agreement of DHS medical officers prior to their transfer."

Decision and Order, PERB Case No. 97–U–25, Opinion No. 539 (February 23, 1998) (*Op. No. 539*), at 2. Furthermore:

DCGH, like the PBC, was under no obligation to alter the contractual terms

and conditions of employment of PBC bargaining unit employees as existed at the time of their transfer into the PBC. This includes the salaries, albeit disparate, of the former DHS and DCGH medical officers. In our view, the intent of this mandate [7] was to maintain the status quo of affected bargaining unit employees in the interest of achieving a high degree of labor-management stability during the transitional period following the establishment of the PBC.

In light of the above, we must reject the Hearing Examiner's findings that DCGH/PBC violated the CMPA by its failure unilaterally to effect wage parity during the transitional period. Therefore, notwithstanding its motive, DCGH has no legal duty to change employee compensation. As a result, under these facts, the [PBC] Act precludes the finding of a violation of the CMPA by DCGH's failure to afford [Doctors Council–Hospital Physicians'] medical officers wage parity with [Doctors Council–Clinic Physicians] medical officers prior to our determination of appropriate units at the PBC.

*Op. No. 539,* at 4.

However, PERB decided that "the record supports the conclusions that DCGH improperly interfered with the existence of [Doctors Council–Hospital Physicians] by displaying a bias against [it] at a time when unit determinations and certification of bargaining representatives at the PBC remained pending before the Board," and PERB "adopt[ed] the Hearing Examiner's conclusion that DCGH/PBC committed un-

fair labor practices in violation of D.C.Code [§ ] 1–618.4(a)(2)." But PERB asserted "that the unlawful conduct by DCGH/PBC consist[ed] of its less than even-handed treatment of the [Doctors Council–Hospital Physicians], not its assistance to Doctors Council–Clinic Physicians as found by the Hearing Examiner." *Op. No. 539,* at 4. The PERB also declared that:

> DCGH's conduct is unlawful because it undermined the Complainant Doctors Council–Hospital Physicians, not because it had a constructive collective bargaining relationship with Complainant's rival, [Doctors Council–Clinic Physicians]. We find further that by engaging in such conduct during this period, DCGH/PBC has improperly interfered with employees' right of free choice under D.C.Code § 1–618.6(a)(1) and (2) in violation of D.C.Code § 1–618.4(a)(1).

*Op. No. 539,* at 4–5. PERB concluded by stating: "In all other respects, the [c]omplaint is dismissed." Thus, PERB upheld the Hearing Examiner's decision in favor of Doctors Council–Hospital Physicians with respect to § 1–618.4(a)(2) (for different reasons), but rejected the Hearing Examiner's conclusions with regard to § 1–618.4(a)(3) and (5).

Doctors Council–Hospital Physicians petitioned the Superior Court of the District of Columbia for review of the PERB's decision on March 24, 1998. That court denied the petition on October 1, 2002, and affirmed the PERB's decision. After applying a deferential standard of review, the

---

7. The "mandate" was set forth in D.C.Code § 32–262.8(h) (1998), recodified as § 44–1102.08(h), which provided:

> The [PBC] shall assume and be bound by all existing collective bargaining agreements with labor organizations that have been duly certified by the District of Columbia Public Employee Relations Board to

represent employees transferred to the [PBC] until successor agreements have been negotiated. Negotiations between the [PBC] and the labor organizations that have been certified to represent its employees shall commence not later than 180 days after the first meeting of the [PBC] Board.

court concluded that the PERB's interpretation of the transitional period under the Act, D.C.Code § 32–262.8(h) was "reasonable" and "fully consistent with the precise language of the statute." As the court put it:

> [T]his court must conclude that the PERB's interpretation that the PBC Act required the maintenance of the status quo with regard to collective bargaining agreements during its transitional period, and thus, that DCGH was not required to effect wage parity during this period, is not clearly erroneous, given the deference to be applied to the PERB's determination.

The court also considered, but found "unpersuasive, Doctors Council–Hospital Physicians' alternative argument," that "the unfair labor practices by DCGH occurred prior to the October 1, 1997 transfer of its members to the PBC," and that "DCGH still remains liable for the disparate treatment of [Doctors Council–Hospital Physicians] and its members."[8] Doctors Council–Hospital Physicians filed a timely notice of appeal.

The case was argued in this court on January 7, 2004. On January 20, 2004, we issued an order remanding "the record in this case ... to the PERB for further proceedings and a revised opinion." We specified two questions for clarification and explanation concerning the date of the compensation parity agreement and the PERB's treatment of that agreement in another case, *Op. No. 604, supra,* recognizing a mid-September 1996 compensation parity agreement between Doctors Council–Hospital Physicians and DCGH. There, PERB dismissed an unfair labor practice complaint brought by Doctors Council–Clinic Physicians against the PBC. Doctors Council–Clinic Physicians had alleged that "the PBC and [Doctors Council–Hospital Physicians] unlawfully negotiated a pay increase for only the [Doctors Council–Hospital Physicians]-represented medical officers." PERB rejected [Doctors Council–Clinic Physicians'] complaint since: "The Hearing Examiner concluded that the agreement between DCGH and [Doctors Council–Hospital Physicians] was reached by mid-September 1996. Since the agreement predates the October 1, 1996 transfer of affected agencies/employees to the PBC's authority, existing PERB precedent does not restrict DCGH's authorization to make the agreement." *Op. No. 604,* at 6. In *Op. No. 604,* PERB not only referred to its *Op. No. 539* relating to the case now before us, but also noted the distinction:

> The medical officers represented by [Doctors Council–Hospital Physicians] have been employed by DCGH for many years, and have been represented there by [Doctors Council–Hospital Physicians] since 1985.... They were transferred to the PBC on October 1, 1997.... The unfair labor practices all occurred well prior to October 1, 1997, as the complaint was filed June 19, 1997.... The remedy proposed by the Hearing Examiner went back to October 1, 1996.... [E]ven if there were any basis for the PERB's [interpretation of] the PBC Act ..., the PBC Act ... would nonetheless be entirely inapplicable to the unfair labor practices committed by DCGH against its own long-time employees before they were transferred to the PBC.

---

8. The trial court apparently inadvertently misstated part of Doctors Council–Hospital Physicians' alternative argument by saying that: "Thus, petitioner argues that since the Clinics' medical officers were 'long time' employees before they were transferred to the PBC, DCGH still remains liable for the disparate treatment of petitioner and its members." The petitioner, Doctors Council–Hospital Physicians, represented DCGH medical officers, not medical officers employed at community health clinics, and its alternative argument related to medical officers employed by DCGH prior to the transfer of the hospital's functions to the PBC. Doctors Council–Hospital Physicians articulated its alternative argument in its brief submitted to the Superior Court, in part, as follows:

Since the wage increase agreement was reached *before* DCGH's transfer to the PBC, the Board's holding in PERB Case No. 97–U–25, Slip No. Op. 539—concerning the PBC's obligation with respect to reaching and effecting agreements reached *after* DCGH and other affected agencies were transferred to it—is not applicable.... [The] disputed wage parity increase did not result from the PBC's discretion or mutual agreement to bargain with [Doctors Council–Hospital Physicians]. Instead, the PBC implemented the wage increase because it was binding on it as a "bargained terms and conditions of employment reached [] *by agreement* ... before the transfer of covered employees" to the PBC. *D.C. Nurses Association v. D.C. Health and Hospitals Public Benefit Corporation, D.C. General Hospital, et al.,* Slip Op. 565. As such, "the PBC was bound to do so once covered DCGH medical officers were transferred to its jurisdiction."

*Op. No. 604, supra,* at 9 n. 5 (emphasis in original). In remanding the record in this case to PERB, we wanted to know whether the agreement discussed in *Op. No. 604* was the same as that in *Op. No. 539.* PERB's short answer in its decision and order filed with this court on August 11, 2005, was "no," maintaining that "the factual record upon which [PERB] based its conclusions in Slip Op. No. 604 has no legal relevance to the administrative record before [PERB] in Slip. Op. No. 539, and the certified record of the [PERB's] proceedings which is on appeal before the Court." Decision and Order on Remand, PERB Case No. 97–U–25, Opinion No. 800, at 2 (*Op. No. 800* ). PERB asserted that the parties in *Op. No. 604* "elected to stipulate that the disputed wage increase agreement

'was reached by mid-September 1996,' [and][a]s a result of the stipulation by the parties, the date of the agreement was not contested in the proceedings leading to Opinion No. 604." *Op. No. 800,* at 4. PERB also indicated that "[Doctors Council–Hospital Physicians] maintained in the proceedings before the PERB [in the instant case] that the new labor agreement was signed in late January 1997." *Op. No. 800,* at 2. PERB did not respond directly to the second record remand question posed by this court: "If the [Doctors Council–Hospital Physicians]/DCGH agreement is the same one discussed in both cases," should the legal conclusion in both cases be the same with respect to its binding effect? If the answer is yes, is the [Doctors Council–Hospital Physicians] entitled to any compensation in this case? Instead, PERB stated:

We believe that PERB Case No. 97–U–25 (Slip Op. No. 539) was properly decided based upon the administrative record before the Board, and necessarily without reference to factual allegations raised later in connection with a subsequent case. [Doctors Council–Hospital Physicians'] characterization of uncontested, stipulated facts in connection with Opinion Number 604 has no legal relevance to [PERB's] decision in Opinion Number 539.

*Op. No. 800,* at 5. We requested supplemental briefs which were filed on September 26, 2005 and October 11, 2005.[9]

## ANALYSIS

Doctors Council–Hospital Physicians contends that the PERB erred by "appl[ying] the PBC Act to [Doctors Council–Hospital Physicians'] members long before they became PBC employees, and even before the PBC began operations."

9. On August 30, 2006, we requested a document referenced in PERB's original and remand decisions and that document was provided on October 20, 2006.

It claims that PERB improperly applied the effective date of the Act, August 28, 1996, to this case, because "[t]he PBC Act was not signed by the Mayor until December 19, 1996;" and because "[t]he PBC Act provided for various PERB operations to run at specified times after the first meeting of the PBC board of directors," and "[t]he PBC did not take over the operations of the Hospital until October 1, 1997." However, "[t]he Hospital and [Doctors Council–Hospital Physicians] had agreed on a new labor agreement with 'wage parity' between [Doctors Council–Hospital Physicians'] members and [Doctors Council–Clinic Physicians'] members repeatedly—in September 1996, in January 1997, in March 1997, and so on." Furthermore, Doctors Council–Clinic Physicians' doctors were not involved in the October 1, 1996 transfer to DCGH since they already were DCGH employees, and hence, "[n]o change in employment status of Doctors Council–Hospital Physicians' members occurred until they became PBC employees a full year later, October 1, 1997." Doctors Council–Hospital Physicians' doctors remained DCGH employees until that date, "as they had been without interruption since [Doctors Council–Hospital Physicians] was certified in 1985." Consequently, Doctors Council–Hospital Physicians argues, Hospital doctors did not fall under the bargaining constraints of the PBC Act until October 1, 1997.

In its supplemental brief, Doctors Council–Hospital Physicians emphasizes that, " 'since at least September 18, 1996, the Hospital and [Doctors Council–Hospital Physicians] agreed that the compensation of Hospital based doctors would be brought up to parity with the clinic medical officers,' " as evidenced by the stipulation referenced in *Op. No. 604.* DCDCGH argues that "the record[s] in both [the case now before us and that resulting in *Op. No. 604* ] are devoid of any denial by the

PBC or its predecessor the Hospital that agreement on parity pay existed [as of that] time." Doctors Council–Hospital Physicians faults PERB for not "reconcil[ing] those decisions." Rather than being initiated in 1997, as PERB concludes, Doctors Council–Hospital Physicians contends, in part, that Dr. Dais' testimony in this case reveals "that the parity pay agreement between the parties was initiated earlier, in September 1996," and that DCGH never took the position that the claim for wage parity was not appropriate.

PERB disagrees with Doctors Council–Hospital Physicians' position that the PBC Act did not apply to Doctors Council–Hospital Physicians' doctors until October 1, 1997 when the PBC assumed actual management and control of DCGH. Rather, PERB maintains, in its initial brief, that consistent with its decision in *Op. No. 525,* the November 1, 1996, Interagency Agreement between DCGH and DHS (under which DCGH "assume[d] interim operational control over the DHS clinics"), "DCGH was subject to the same constraints as the PBC with respect to maintaining pre-existing agreements with pre-existing labor organizations," *Op. No. 525,* at 5, even though the PBC Act refers only to the PBC, not DCGH. Therefore, "as of October 1, 1996, after the PBC Act was effective, the [Doctors Council–Hospital Physicians], [Doctors Council–Clinic Physicians], DCGH, and PBC were bound by existing collective bargaining agreements." PERB also contends that it correctly concluded "that DCGH's failure to effect wage parity during the PBC's transitional period was not an unfair labor practice." In its supplemental brief, PERB insists, as it did in its remand decision, that "the factual record upon which [it] based its conclusions in Slip Op. No. 604 has no legal relevance to the administrative record before [PERB] in Slip. Op. No. 539 . . . ."

## Standard of Review

 "Although this is an appeal from a review of agency action by the Superior Court rather than a direct appeal to this court, we review the PERB decision as if the matter had been heard initially in this court." *Gibson v. District of Columbia Pub. Employee Relations Bd.*, 785 A.2d 1238, 1241 (D.C.2001) (citing *Public Employee Relations Bd. v. Washington Teachers' Union Local 6*, 556 A.2d 206, 207 (D.C.1989)). Generally, like the Superior Court, we examine whether the factual findings are "supported by substantial evidence and [are] not clearly erroneous as a matter of law." *Teamsters Union 1714 v. Public Employee Relations Bd.*, 579 A.2d 706, 709 (D.C.1990) (citation and internal quotation marks omitted). On legal issues, "we defer to the PERB's interpretation of the CMPA['s unfair labor practices provisions] and will not reverse unless the interpretation is unreasonable in light· of the prevailing law or inconsistent with the statute." *Id.* (citations omitted). "However, 'we are not obliged to stand aside and affirm an administrative determination which reflects a misconception of the relevant law or a faulty application of the law.'" *Id.* (quoting *Thomas v. District of Columbia Dep't of Labor*, 409 A.2d 164, 169 (D.C.1979)) (other citation omitted). "Similarly, we cannot affirm an agency decision if 'we cannot confidently ascertain either the precise legal principles on which the agency relied or its underlying factual determinations.'" *Id.* (quoting *Long v. District of Columbia Dep't of Employment Servs.*, 570 A.2d 301, 305 (D.C.1990)).

 With respect to statutory construction issues, "we give careful consideration to the agency's interpretation [of its governing statute] because legal interpretations by tribunals having expertise are helpful even if not compelling." *See Abadie v. Organization for Envtl. Growth,* *Inc.*, 806 A.2d 1225, 1227 (D.C.2002) (citations and internal quotation marks omitted). "The last word [concerning the meaning of the applicable statute], however, is the court's, for" "the judiciary is the final authority on issues of statutory construction." *Belcon, Inc. v. District of Columbia Water & Sewer Auth.*, 826 A.2d 380, 384 (D.C.2003) (citation omitted). "We look to the plain meaning of the statute first, construing words according to their ordinary meaning." *J. Boyle v. T.H. Giral, et al.*, 820 A.2d 561, 568 (D.C.2003) (citing *J. Parreco & Son v. Rental Hous. Comm'n*, 567 A.2d 43, 45 (D.C.1989)). "If divers statutes relate to the same thing, they ought to be taken into consideration in construing any one of them...." *Luck v. District of Columbia*, 617 A.2d 509, 514 (D.C.1992) (citations and internal quotation marks omitted). If related statutes conflict, we must reconcile them. *See Gonzalez v. United States*, 498 A.2d 1172, 1174 (D.C.1985).

We begin our analysis of this case with the pertinent statutory provisions: (1) relevant sections of the PBC Act, which have been repealed, in particular § 207 (Transfer of functions to the [PBC]), D.C.Code § 32–262.7 (1998); § 208 (Personnel. Administration), D.C.Code § 32–262.8; § 402 (Repealing the District of Columbia General Hospital Commission Act), D.C.Code §§ 32–201 *et seq.;* and § 501(c) (Effective Date of repeal of the D.C. General Hospital Commission Act); and (2) subsections of the unfair labor practices section of D.C.Code § 1–618.4—that is, §§ 1–618.4(a)(2), (3) and (5) (1999). In its *Op. No. 539*, PERB clearly focused on D.C.Code § 32–262.8(h), stating: "Critical to the determination of a violation of the asserted unfair labor practices is the meaning and application of Sec. 262.8(h) of the [PBC] Act ... to the facts of this case." *Op. No. 539*, at 2. PERB proceeded

to analyze § 32–262.8(h) and to reference its analysis of this section in its *Op. No. 525.* However, while PERB accepted the Hearing Examiner's findings and conclusion under D.C.Code § 1–618.4(a)(2), but for a different reason—"less than even-handed treatment" of the DCDCGH—, there was no comparable analysis of D.C.Code § 1–618.4(a)(3) pertaining to discrimination with regard to "any term or condition of employment to encourage or discourage membership in any labor organization," which raised the pay parity issue decided in favor of DCDCGH by the Hearing Examiner, or § 1–618.4(a)(5) concerning a "refus[al] to bargain collectively in good faith with the exclusive representative."

### The Statutory Issue

 Under the applicable canons of statutory construction, "[i]f divers statutes relate to the same thing, they ought to be taken into consideration in construing any of them....," *Luck, supra,* 617 A.2d at 514; and if related statutes conflict, we must reconcile them, *Gonzalez, supra,* 498 A.2d at 1174. And, while we examine the plain meaning of the statutory provisions, *J. Parreco & Son, supra,* 567 A.2d at 45, the "literal words of [a] statute ... are to be read in light of the statute taken as a whole, and are to be given a sensible construction and one that would not work an obvious injustice." *District of Columbia v. Gallagher,* 734 A.2d 1087, 1091 (D.C.1999) (quoting *Metzler v. Edwards,* 53 A.2d 42, 44 (D.C.1947)) (footnotes and internal quotation marks omitted) (other citations omitted). Rather than considering § 32–262.8(h) and § 1–618.4(a)(3) and (5) together and reading them in light of the statutes as a whole, PERB implicitly chose to give priority to § 32–262.8(h) without determining whether each of the provisions could be given effect or whether they could be reconciled. In essence, PERB decided that the PBC Act, whose "goal" was to

provide "comprehensive community-centered health care" to District of Columbia residents, D.C.Code § 32–261.1(d) (1998), in an efficient and financially sound manner, § 32–261.1(e), trumped § 1–618.4(a)(3) prohibiting an unfair labor practice designed to preclude discrimination with respect to "any term or condition of employment [here, pay parity] to encourage or discourage membership in any labor organization," and (a)(5) prohibiting a refusal to bargain in good faith with the exclusive labor representative. However, neither the plain words of the PBC Act, nor its legislative history, nor the statute read as a whole, manifest such a legislative intent.

D.C.Code § 32–262.8(h) contained two sentences. One indicated that the PBC would be bound by existing collective bargaining agreements with certified labor organizations until new agreements have been negotiated. See note 7 *infra.* The second sentence concerned the timing of negotiations between the PBC and certified labor organizations. Therefore, the plain words of the provision did not even remotely hint that this section was designed to take precedence over the fair labor practices required by § 1–618.4(a)(3) and (a)(5). Nor was there any other section of the PBC Act which embodied the notion that the unfair labor practices subsections of the CMPA had to be disregarded in order to achieve the Act's legislative intent. Significantly, the legislative history of § 32–262.8(h) stated:

The Committee Print [of the proposed legislation] adds a new subsection (h) which would "grandfather current practitioners from requirements by the PBC that they be certified by their respective disciplines." This amendment was recommended by labor representatives and agreed to by the Executive Branch. The Committee Print also contains tech-

nical amendments to this section correcting the incomplete references to which titles of the CMPA apply to PBC employees.

COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON HUMAN SERVICES, Report on Bill 11–604, the "District of Columbia Health and Hospitals Public Benefit Corporation Act of 1996," May 16, 1996, at 7. Indeed, the rest of the legislative history governing § 32–262.8 showed that the section was designed to deal with specific issues of personnel administration raised by the transfer of employees to a new entity— issues such as the applicability of sections of the CMPA to the transferred employees, retirement and early out considerations, and reemployment factors.

 D.C.Code § 1–618.4(a) is clear on its face. It prohibits "the District, its agents, and representatives" from engaging in certain kinds of unfair labor practices, including (1) "interfering with ... the existence or administration of any labor organization ..." (§ 1–618.4(a)(2)); (2) discriminating in regards to ... "any term or condition of employment to encourage or discourage membership in any labor organization ..." (§ 1–618.4(a)(3)); and (3) "refusing to bargain collectively in good faith with the exclusive representative" of a labor organization (§ 1–618.4(a)(5)). Section 1–618.4(a) is modeled on, and virtually identical to, the comparable federal statutory provision, 29 U.S.C. § 158 (1998). *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON GOVERNMENT OPERATIONS, Report on Bill No. 2–10, "District of Columbia Government Comprehensive Merit Personnel Act of 1978," July 5, 1979, at 102. And, as the Supreme Court indicated in *American Ship Bldg. Co. v. National Labor Relations Bd.,* 380 U.S. 300, 311, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), "Section 8(a)(3) [of the National Labor Relations Act, on which § 1–618.4(a)(3) is modeled]

prohibits discrimination in regard to tenure or other conditions of employment to discourage union membership;" and "[u]nder the words of the statute there must be both discrimination and a resulting discouragement of union membership." *Id.* Furthermore, the plain and ordinary meaning of the words contained in § 1–618.4(a)(5) prohibit refusals to bargain in good faith. *See National Labor Relations Bd. v. Dalton Brick & Tile Corp.,* 301 F.2d 886, 889 (5th Cir.1962); *see also National Labor Relations Bd. v. Insurance Agents' Int'l Union, AFL–CIO,* 361 U.S. 477, 488, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960) ("[T]he policy of Congress [and of the Council] is to impose a mutual duty upon the parties to confer in good faith with a desire to reach agreement, in the belief that such an approach from both sides of the table promotes the over-all design of achieving industrial peace") (citation omitted).

While we normally defer to the PERB's interpretation of sections of the CMPA over which it has special expertise, *Teamsters Union 1714, supra,* 579 A.2d at 709, its interpretation giving priority to D.C.Code § 32–262.8(h) over § 1–618.4(a)(3) is not binding on us because "we are not obliged to ... affirm an administrative determination which reflects a misconception of the relevant law or a faulty application of the law," *id.,* and "we cannot affirm an agency decision if we cannot confidently ascertain ... the precise legal principles on which the agency relied...." *Id.* We hold that PERB manifested a misconception of the relevant law and engaged in a faulty application of the law not only by failing to consider the plain words of D.C.Code § 32–262.8(h), the legislative history, and the PBC Act as a whole, but also by not considering § 32–262.8(h) and D.C.Code § 1–618.4(a)(3) and (5) together to ascertain whether these provisions could be reconciled, if indeed they conflicted.

When these provisions are read together, we conclude that § 32–262.8(h) pertaining to personnel administration under the PBC Act, and § 1–618.4(a)(3) concerning a prohibition, as an unfair labor practice, on "discriminating" with respect to "any term or condition of employment to encourage or discourage membership in any labor organization," and § 1–618.4(a)(5) prohibiting a refusal to bargain collectively in good faith with the exclusive representative (here, the exclusive representative of the Hospital doctors) can be construed together and reconciled in a manner that achieves the legislative intent behind all of these sections. Consequently, PERB incorrectly dismissed DCDCGH's complaint regarding DCGH's discriminatory action in failing to implement the pay parity agreement between it and DCDCGH, and concomitantly, in discouraging membership in DCDCGH and encouraging membership in DCDC because doctors represented by DCDC earned about $10,000 more in pay annually than doctors represented by DCDCGH, and in refusing to bargain in good faith with DCDCGH in early 1997 with respect to a new compensation agreement.

Two of the central questions that must be resolved in applying these statutory provisions are: (1) when did the transfer of Hospital doctors to the authority of the PBC take place,[10] and (2) when did the agreement between DCGH and Doctors Council–Hospital Physicians occur with respect to the pay parity compensation term or condition of employment?[11] According to the PERB, the significance of the date of transfer is that "the PBC was bound to implement bargained terms and conditions of employment reached ... by agreement ... initiated before the transfer of covered employees." *Op. No. 565,* at 6. In that regard, the date of the transfer of Hospital doctors to the authority of the PBC depends upon the statutory provisions of the PBC Act, rather than upon the Interagency Agreement between DCGH and DHS (CPH) ("entered into" on November 1, 1996 according to the agreement, but actually executed on November 6, 1996), since the Interagency Agreement mentions neither the Hospital doctors nor the PBC.[12] Specifically, § 207 of the PBC Act, D.C.Code 32–262.7, concerned the transfer of functions to the PBC and provided that the transfer is to occur "as expeditiously as possible but no later than 6 months from the date of the first meeting of the [PBC] Board."[13] We have found no legal

10. Doctors Council–Hospital Physicians argues that PERB incorrectly applied the PBC Act to its members before they became PBC employees, and before the PBC began operations on October 1, 1997, whereas PERB insists that the PBC Act applied to Hospital doctors as of October 1, 1996.

11. Doctors Council–Hospital Physicians maintains that DCGH and Doctors Council–Hospital Physicians reached a pay parity agreement in September 1996, and also concurred with respect to a new compensation agreement with pay parity in early 1997, which DCGH refused to honor. PERB argues that DCGH and Doctors Council–Hospital Physicians did not reach a pay parity agreement prior to the transfer of Hospital doctors to the PBC, and that DCGH had no

obligation to "unilaterally effect wage parity during the transitional period."

12. In its *Op. No. 565,* PERB declared: "DCGH and other affected agencies were transferred to the jurisdiction of the PBC sometime between September 29 and October 1, 1996." *Id.* at 6. As authority for this assertion, PERB cites to its *Op. No. 525,* at 4. But the applicable sentence in *Op. No. 525,* at 4 refers only to medical doctors who worked at clinics: "The asserted transfer of these medical officers, who continued to work at their respective public health clinics, occurred sometime between September 29 and October 1, 1996." *Id.*

13. Section 204(h) of the PBC Act, D.C.Code § 32–262.4 stated: "The Board shall hold its

document in the record before us indicating that the Hospital doctors were transferred to the PBC prior to the first meeting of the PBC Board on December 17, 1996.

Section 207 (a)(3), D.C.Code § 32–262.7(a), required the PBC to take certain steps in preparation for the transfer: (1) "prepare an operational and organizational plan to carry out its responsibilities . . . , which shall be submitted to the Council for review and approval;" (2) "promulgate, policies, practices, and procedures relating to terms and conditions of employment of personnel employed by [the PBC];" and (3) "issue regulations governing contracting and procurement." Section 207(a)(4), D.C.Code § 32–262.7(a)(4) also provided that after Council approval of the PBC's operational and organizational plan, the Mayor was required to "transfer to the [PBC's] management and control the functions, assets, property, records, and obligations of" DCGH and other entities. And, section 402 of the PBC Act, which repealed the D.C. General Hospital Commission Act, became effective, in accordance with § 501(c) of the PBC Act "upon the first meeting of the Board pursuant to section 204(h)." Thus, in the absence of any legal document indicating otherwise, the earliest date on which the PBC could have assumed legal control over DCGH and its Hospital doctors, was December 17, 1996, the first meeting of the PBC Board. In addition PERB concluded that it was not until "October 1, 1997," that "the PBC assumed actual management and control of the functions of the agencies placed under it." *Op. No. 525*, at 7 n. 8; *see also Op. No. 604*, at n. 4. Therefore, if DCGH and

Doctors Council–Hospital Physicians reached agreement on pay parity of Doctors Council–Hospital Physicians with Doctors Council–Clinic Physicians prior to at least December 17, 1996, that agreement was binding on DCGH/PBC under § 32–262.8(h) as an "existing collective bargaining agreement," and Doctors Council–Hospital Physicians' complaint regarding pay parity should not have been dismissed. As PERB stated in *Op. No. 565, supra:* "We hold . . . that the PBC was bound to implement bargained terms and conditions of employment reached . . . by agreement . . . initiated before the transfer of covered employees." *Id.* at 6. Once agreement is reached, it is "binding on the PBC so long as DCGH and the union (1) have exhausted their negotiations over the agreement and (2) have initiated the CMPA's requirements for . . . compensation agreement approval prior to the time DCGH became subject to the bargaining restrictions under the PBC Act. . . ." *Op. No. 604* at 7–8.

### The 1996 Pay Parity Agreement for Hospital Physicians

■ The second key question, then, is when did DCGH and Doctors Council–Hospital Physicians agree on pay parity for Hospital doctors as a term or condition of their employment.[14] This is one of the questions on which we sought PERB's clarification due to the identification of that date in another but related case as mid-September 1996. PERB declined to clarify the issue, claiming that "the factual record upon which [PERB] based its conclusions in [*Op. No. 604*] has no legal relevance to the administrative record before [PERB] in [*Op. No. 539*] . . . ," and

---

first meeting no later than 15 days from the date of appointment of at least 8 Board members. . . . "

**14.** In this case, the Hearing Examiner obviously focused on both a 1996 pay parity

agreement in finding a violation of section 1–618.4(a)(3), and a 1997 new compensation reflecting pay parity in finding a violation of section 1–618.4(a)(5).

that the mid-September 1996 date resulted from a stipulation of the parties in the case involving *Op. No. 604,* where the issue of a pay parity agreement between Doctors Council–Hospital Physicians and DCGH was addressed. There, the Hearing Examiner stated, in part: "On or about September 18, 1996, D.C. General Hospital and DCDCGH agreed that the compensation of [H]ospital doctors would be brought up to parity with the compensation of clinic doctors (Stipulation in Lieu of Testimony, No. 13)." *DCDC v. DCDCGH & DCHHPBC,* No. 99–U–02, Hearing Examiner's Report and Recommendation, April 8, 1999, at 5. Subsequently, in *Op. No. 604.* PERB made a distinction between the September 1996 agreement and later efforts to negotiate a new compensation agreement, stating: "[T]he Hearing Examiner found the mid-September 1996 agreement to be separate and apart from a subsequent effort by [Doctors Council–Hospital Physicians] to negotiate with DCGH over a compensation agreement." *Op. No. 604,* at 7. In addition, PERB "determined that an agreement is effectively binding when 'actually reached. . . .'" *Id.* at 8.

We are not persuaded, as PERB argues, that PERB Case No. 99–U–02, *Op. No. 604,* finding a mid-September 1996 agreement between Doctors Council–Hospital Physicians and DCGH concerning pay parity for Hospital doctors that was separate and apart from efforts in 1997 to negotiate a new compensation agreement with pay parity, is irrelevant to this case. There is evidence in the instant case lending support to the earlier stipulation and finding that a pay parity agreement between Doctors Council–Hospital Physicians and DCGH was reached in mid-September 1996. Dr. Dais' testimony in this case, which was credited by the Hearing Examiner, indicated that Doctors Council–Hospital Physicians made demands for pay parity in September 1996, as soon as the rumor surfaced concerning the then forthcoming transfer of clinic doctors, represented by DCDC, from DHS (CPH) to DCGH. Moreover, the Hearing Examiner in this case made a factual finding that: "When Complainant Union [Doctors Council–Hospital Physicians] raised the issue with Respondent [DCGH,] there was no disagreement over the need to adjust the pay scale to provide parity for the [H]ospital medical officers." Hearing Examiner's Report and Recommendation, PERB Case No. 97–U–25, at 6. Furthermore, DCGH/PBC voluntarily agreed to and never denied the accuracy of the mid-September 1996 date in PERB Case No. 99–U–02. In addition, it is reasonable to infer that that DCGH and Doctors Council–Hospital Physicians reached agreement on pay parity prior to November 5, 1996, when the Executive Director of DCGH sent his memorandum to the City Administrator "request[ing][his] approval for [DCGH]" to resolve the "significant pay disparity" between Hospital and clinic doctors.

◼ Thus, when statutory interpretation principles are applied to the PBC Act, as well as the pertinent CMPA provisions, and the record in this case is reviewed together with the factual findings and credibility determinations of the Hearing Examiner, the transfer of Hospital doctors to the PBC did not occur prior to December 15, 1996, and DCGH and before that date, Doctors Council–Hospital Physicians agreed upon pay parity of the Doctors Council–Hospital Physicians-represented doctors with the Doctors Council–Clinic Physicians-represented doctors. Despite the agreement, DCGH failed to implement the agreement for a discriminatory reason that constituted an unfair labor practice—discouraging doctors from acquiring membership in Doctors Council–Hospital Physicians and encouraging them to become

members of Doctors Council–Clinic Physicians. PERB discounted DCGH's motive stating, "notwithstanding its motive, DCGH has no legal duty to change compensation," *Op. No. 539*, at 4, and "reject[ing] the Hearing Examiner's findings that DCGH/PBC violated the CMPA by its failure unilaterally to effect wage parity during the transitional period." *Id.* But here, there is no question of unilateral action by DCGH/PBC since a Hearing Examiner found in PERB Case No. 99–U–02 that DCGH and Doctors Council–Hospital Physicians agreed to effect pay parity in mid-September 1996, and since the Hearing Examiner in this case found both that DCGH "has been aware of the [pay parity] problem since at least October 1, 1996," and "there was no disagreement over the need to adjust the pay scale to provide parity for the [H]ospital medical officers." Hearing Examiner's Report and Recommendation in PERB Case No. 97–U–25, at 6.

 Significantly also, PERB did not focus upon all of the words of § 1–618.4(a)(3), notably the words "discriminating ... to encourage or discourage membership in any labor organization." Yet, "[i]t has long been established that a finding of a violation under [29 U.S.C. § 158(a)(3) and the comparable CMPA provision, § 1–618.4(a)(3) ] will normally turn on the employer's motivation." *American Ship Bldg. Co. v. National Labor Relations Bd.*, 380 U.S. at 311, 85 S.Ct. 955 (citation omitted). We see nothing in the PBC Act, including D.C.Code § 32–262.8(h), that conflicts with the plain mandate of § 1–618.4(a)(3). Based on the testimony credited by the Hearing Examiner in this case which reflects not only hostility by DCGH toward Dr. Dais, the then President of Doctors Council–Hospital Physi-

cians, and Ms. Martin, Doctors Council–Hospital Physicians' labor specialist consultant, but also DCGH's explicit expression of preference for Doctors Council–Clinic Physicians in meetings, there is substantial evidence to support the Hearing Examiner's determination that DCGH discriminated against Doctors Council–Hospital Physicians with respect to pay parity as a means of discouraging membership in Doctors Council–Hospital Physicians and encouraging it in Doctors Council–Clinic Physicians. Indeed, in this case PERB determined that DCGH unlawfully interfered with the existence or administration of Doctors Council–Hospital Physicians, in violation of § 1–618.4(a)(2) by engaging in "less than even-handed treatment" and thus "undermined" Doctors Council–Hospital Physicians. *Op. No. 539*, at 4. Consequently, we hold that the PERB erred by rejecting the findings, conclusion and recommendation of the Hearing Examiner with regard to DCGH's violation of D.C.Code § 1–618.4(a)(3).

### Good Faith Bargaining and the New, Early 1997 Compensation Agreement

The PERB did not expressly address the Hearing Examiner's findings and conclusions regarding DCGH's alleged violation of § 1–618.4(a)(5) by "refusing to bargain collectively in good faith with the exclusive representative" of the Hospital doctors in efforts to implement the early 1997 new compensation agreement containing pay parity. It adopted the Hearing Examiner's conclusion pertaining to § 1–618.4(a)(2), but "[i]n all other respects" dismissed Doctors Council–Hospital Physicians' complaint. *Op. No. 539*, at 4–5. Consequently, we reverse the judgment of the Superior Court, with instructions to remand the case to the PERB with further instructions to vacate its deci-

sion and order dismissing Doctors Council–Hospital Physicians' complaint regarding the violation of D.C.Code § 1–618.4(a)(5) and to decide whether the record supports the Hearing Examiner's findings and conclusions as to DCGH's alleged refusal to bargain in good faith with Doctors Council–Hospital Physicians.

*So ordered.*